555 F.2d 1079
 38 A.L.R.Fed. 928
 Ruth Ann REED, as Administratrix of the Estate of Dan
William Reed, Deceased, and as parent, natural guardian, and
best friend of Cynthia Ann Reed, Debora Lynn Reed and Julie
Marie Reed, all infants, et al., Plaintiffs-Appellees,
v.
Forwood Cloud WISER, Jr. and Richard E. Neuman, Defendants-Appellants.
 No. 233, Docket 76-7247.
 United States Court of Appeals, Second Circuit.
 Argued Nov. 22, 1976.
Decided April 26, 1977
 
 John J. Martin, New York City, (Edward M. O'Brien, Bigham Englar Jones & Houston, New York City, of counsel), for defendants-appellants.
 Melvin I. Friedman, New York City (Lee S. Kreindler, Milton G. Sincoff, Stanley J. Levy, James D. Veach, Kreindler & Kreindler, New York City, of counsel), for plaintiffs-appellees.
 Speiser & Krause, P.C., New York City (Charles F. Krause, Joseph J. Pierini, New York City, of counsel), for amicus curiae Sotirios Karras, et al.
 Before MANSFIELD, VAN GRAAFEILAND and MESKILL, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 This case, arising out of an aircraft disaster on the high seas, presents the novel and important question of whether airline employees are entitled to assert as a defense the liability limitations of the Warsaw Convention ("the Convention"),[1] as modified by the Montreal Agreement.[2] We hold that employees are entitled to do so, and reverse and remand with instructions to reinstate the defense.
 
 
 2
 On September 8, 1974, Trans World Airlines ("TWA") Flight 841 from Tel Aviv to New York via Athens and Rome crashed into the high seas some 50 nautical miles west of Cephalonia, Greece, killing all 79 passengers and 9 crew members on board. Under the Warsaw Convention, as modified by the Montreal Agreement, TWA would ordinarily be absolutely liable for the deaths of the 79 passengers, but its liability would be limited in amount to $75,000 per passenger unless plaintiffs could show willful misconduct. Instead of suing TWA, however, the administrators and executors in this case sued the President of the company and his Vice-President of Audit and Security in the United States District Court for the District of New Jersey, alleging that defendants were responsible for security on TWA flights and negligently failed to prevent the placing on board of a bomb which is alleged to have exploded and caused the disaster. Defendants denied negligence and also pleaded the liability limits of the Warsaw Convention as modified by the Montreal Agreement. On January 26, 1976, the Judicial Panel on Multidistrict Litigation transferred all federal court litigation arising out of the accident to Judge Frankel of the Southern District of New York. In re Air Crash in the Ionian Sea, 407 F.Supp. 238 (Jud.Pan.Mult.Lit.1976). Plaintiffs moved to strike the defense of limited liability and Judge Frankel granted their motion, certifying to this court under 28 U.S.C. § 1292(b) the question of whether these defendants are entitled to assert the Warsaw limits.
 
 
 3
 In a carefully considered opinion Judge Frankel, after finding the language of the Convention to be silent on the issue before him and gaining little light from its legislative history, pointed to several factors leading him to the conclusion that the Convention's liability limitations should not be extended to airline employees. In his view the deciding factors were the Convention's failure expressly to extend the limits to agents or employees even though agents were mentioned in some other respects, the fact that limits were no longer needed to protect air travel as an infant industry, the strong policy against stipulations by carriers restricting tort liability based on the negligence of their employees, the criticism voiced of the Convention's limitations by some quarters in the United States, the Supreme Court's refusal to extend similar liability limitation provisions of the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(5), to stevedores or other agents, and the failure of the United States to ratify the so-called 1955 Hague Protocol, adopted by most of the Convention's signatories, which expressly extended the Convention's liability limits to a carrier's employees and agents acting within the scope of their employment. From this decision the TWA officer-defendants appeal.
 
 DISCUSSION
 
 4
 The question of whether an airline employee sued for damages for personal injuries suffered in an international airplane accident may invoke the Convention's liability limitations is of great importance to international air disaster litigation and, so far as we know, is here raised for the first time at the federal appellate level. The few American trial court decisions on the issue have split. Compare Pierre v. Eastern Air Lines, Inc., 152 F.Supp. 486, 489 (D.N.J.1957) (employees not protected), with Chutter v. KLM Royal Dutch Airlines, 132 F. Supp. 611, 613 (S.D.N.Y.1955) (agents protected), and Wanderer v. Sabena, 1949 U.S. Aviation Rep. 25 (Sup.Ct.N.Y.Co.1949) (agents protected). Although victims of international air disasters have hitherto almost without exception limited themselves to seeking redress from the airline company owning or operating the plane involved, or from the manufacturer of the plane, the pilot ordinarily may also be held liable for damages caused by his operation of the plane, either under the common law doctrine of res ipsa loquitur[3] or the civil law doctrine that the person controlling the vehicle is absolutely liable for injuries resulting from an accident, regardless of the absence of fault or negligence.[4] Similarly, as in this case, other employees can often plausibly be alleged to have been negligent or otherwise responsible for the injuries. Should employees not be covered by the provisions of the Convention, the entire character of international air disaster litigation involving planes owned and operated by American airlines, would be radically changed. The liability limitations of the Convention could then be circumvented by the simple device of a suit against the pilot and/or other employees, which would force the American employer, if it had not already done so, to provide indemnity for higher recoveries as the price for service by employees who are essential to the continued operation of its airline. The increased cost would, of course, be passed on to passengers.
 
 
 5
 The most immediately relevant provisions of the Convention are Article 17 (imposing on the carrier liability for the death or injury of a passenger arising from an accident sustained on an aircraft), Article 22 (limiting the carrier's liability for each passenger to a fixed sum of francs) and Article 24 (providing that any action for damages under Article 17 is subject to the conditions and limits of the Convention). The pertinent portions of these Articles, in the official French text ratified by the Senate, 49 Stat. 3000,[5] and in an unofficial English translation used by the district court,[6] are as follows:
 
 Article 17
 French
 
 6
 (Official)
 
 
 7
 "Le transporteur est responsable du dommage survenu en cas de mort, de blessure ou de toute autre lesion corporelle subie par un voyageur lorsque l'accident qui a cause le dommage s'est produit a bord de l'aeronef ou au cours de toutes operations d'embarquement et de debarquement."
 
 English
 
 8
 (Unofficial)
 
 
 9
 "The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking."Article 22
 
 French
 
 10
 (Official)
 
 
 11
 "(1) Dans le transport des personnes, la responsabilite du transporteur envers chaque voyageur est limitee a la somme de cent vingt cinq mille francs. . . . Toutefois par une convention speciale avec le transporteur le voyageur pourra fixer une limite de responsabilite plus elevee."
 
 English
 
 12
 (Unofficial)
 
 
 13
 "In the transportation of passengers the liability of the carrier for each passenger shall be limited to the sum of 125,000 francs. (In 1934, about $8,300) . . .. Nevertheless, by special contract, the carrier and the passenger may agree to a higher limit of liability."
 
 Article 24
 French
 
 14
 (Official)
 
 
 15
 "(1) Dans les cas prevus aux articles 18 et 19 toute action en responsabilite, a quelque titre que ce soit, ne peut etre exercee que dans les conditions et limites prevues par la presente Convention.
 
 
 16
 "(2) Dans les cas prevus a l'article 17, s'appliquent egalement les dispositions de l'alinea precedent . . . ."
 
 English
 
 17
 (Unofficial)
 
 
 18
 "(1) In the cases covered by articles 18 and 19 any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention.
 
 
 19
 "(2) In the cases covered by article 17 the provisions of the preceding paragraph shall also apply . . . ."
 
 
 20
 The foregoing provisions raise two important questions of interpretation bearing on the issue before us. The first is whether, in the absence of any definition of the term "transporteur" (carrier) used in the Convention, that term is limited to the corporate entity, in this case TWA, or was intended to embrace the group or community of persons actually performing the corporate entity's function. Although under the common law, as the district court noted, "the liability of the wrongdoing agent is a separate and clear source of redress, distinct from and logically prior to that of the principal," the Convention was intended to act as an international uniform law, see Block v. Compagnie Nationale Air France, 386 F.2d 323, 337-38 (5th Cir. 1967), and therefore must be read in the context of the national legal systems of all of its members.[7] While we have not attempted to familiarize ourselves with the legal systems of the over 100 member states, it is clear that in at least some jurisdictions the language of Art. 22(1) would have the effect of limiting the liability of the carrier's employees as well as that of the carrier. As the author of the draft convention submitted to the conference at Warsaw, Professor Ambrosini of Italy, later stated:
 
 
 21
 "He had always thought that the Warsaw Convention regulated not only the liability of the carrier, but, at the same time, that of his servants or agents, and especially for the simple reason that, in his opinion, the carrier and his servants or agents were, from the legal point of view, the same person. But the pilots had always sought a provision in this Convention which would clearly define their own legal situation which was reasonable and appropriate." (Emphasis added)
 
 
 22
 1 International Conference on Private Air Law, The Hague, September, 1955, Minutes 220 (ICAO Doc. 7686-LC/140 1956). Later Professor Ambrosini expanded on this interpretation:
 
 
 23
 "As to the more general question whether the Warsaw Convention provided for the limitation of liability of the servants or agents, his opinion was that, under the general legislative and legal system, servants and agents, as the longa manus of their employer, would enjoy the same situation as the latter. From the legal point of view, there could not be a system whereby the carrier would be liable with limits and the servants and agents without limits."
 
 
 24
 Guadalajara Convention, 1 International Conference on Private Air Law, Guadalajara, August-September, 1961, Minutes, 134 (ICAO Doc. 8301-LC/149-1 1962). See also International Conference on Private Air Law, Guatemala City, Sept. 1961, Minutes 135 (remarks of the delegate from Norway: "From the logical point of view it was difficult to see why the legal situation of the servants and agents would not have to be like that of the carrier himself and be governed by the regime governing the contract of carriage. . . ."); 1 International Conference on Private Air Law, The Hague, Sept. 1955, Minutes 361 (ICAO Doc. 7686-LC/140 1946) (hereinafter cited as "Hague Minutes") (remarks of the delegate from the Philippines: "It was a cardinal principle of the law of principals and agents that the liability of the agent was measured by the liability of the carrier himself under the rule that the liability of the principal was the one that governed."). We cannot, therefore, deem a purely common law reading of the language of Article 22(1) controlling.
 
 
 25
 A second problem of interpretation is that raised by the use of the word "cas" in Articles 17 and 24 of the official French text, supra. It will be noted that in the unofficial English translation used by the district court the word "cas" appearing in Article 17 is translated into "event" (i. e., "in the event of the death or wounding of a passenger"), whereas the same word as used in Article 24(1) and (2) is translated into "cases" (i. e., "In the cases covered by article 17 . . . ."). The latter translation is probably inaccurate for the reason that the word "cas" is not ordinarily used to refer to a lawsuit. Rather it means "event" or "case" in the nonjuridical sense. See J. Jeraute, Vocabulaire Fran cais-Anglais et Anglais-Fran cais de Termes et Locutions Juridiques 209, 302. Thus a less ambiguous rendition of Article 24 for our purposes might be:
 
 
 26
 "(1) In the events anticipated in articles 18 and 19 any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention.
 
 
 27
 "(2) In the events covered by article 17 the provisions of the preceding paragraph shall also apply, . . . ."
 
 
 28
 The expansive language of the official French version of Article 24 would therefore imply that the "conditions and limits set out in this convention" (including the 125,000 franc liability limit set by Article 22 and later increased to $75,000) apply to the present case, since (1) the suit against the carrier's employees is an "action for damages, however founded" (Art. 24(1)) and (2) it seeks damages sustained "in the event of the death . . . of a passenger . . . on board the aircraft . . . ." (Art. 17). Husserl v. Swiss Air Transport Co., Ltd., 388 F.Supp. 1238, 1245 (S.D.N.Y.1975). That the authors of the Convention intended Article 24 to bar circumvention of the Article 22 liability limitations is further attested to by Professor H. Drion, Netherlands representative at the 1955 Hague Conference, who concluded:
 
 
 29
 "It is believed that a sound interpretation, based on the spirit of Article 24 and not conflicting with its letter, leads to the conclusion that any action brought against the carrier's enterprise as such, or against members of it who can be considered part of the enterprise, are to be brought subject to the limits of Article 22. . . . Any other solution would defeat the purpose of Article 24, which is to prevent claimants from avoiding the provisions of the Convention by suing the enterprise outside the contract of carriage."
 
 
 30
 H. Drion, Limitation of Liabilities in International Air Law 158 (1954).
 
 
 31
 Although the legislative history of the Convention does not affirmatively or expressly support the foregoing interpretation, it contains nothing indicating a contrary intention. The most that can be said is that no discussion of the subject at issue here is to be found in the record of the two conferences one in Paris in 1925 and the second in Warsaw in 1929 at which the text was drafted. Appellees' argument that the conferences, by referring the issue of the "legal status" of the captain of the aircraft and of the personnel to the International Technical Committee of Aerial Legal Experts (CITEJA), deliberately set aside the question of employee liability must be rejected. Examination of the draft produced by CITEJA shows that by "legal status" the members of the Warsaw and Paris conferences meant the power of the aircraft commander and the succession to that position by other aircraft personnel in the event of his inability to perform his duties. See 14 J. Air L. & Comm. 84 (1947).
 
 
 32
 Subsequent to the Convention's becoming effective, considerable controversy arose for the next 20 years over whether its liability limits applied to airline employees. A number of commentators took the position that the limits must be read to cover employees, pointing out that otherwise the purposes of the Convention could be completely circumvented. See H. Drion, Limitation of Liabilities in International Air Law 157 (1954) and authorities cited therein. Others opined that the Convention did not cover employee liability. See M. Kamminga, The Aircraft Commander in Commercial Air Transportation 90-92 (1953) and authorities cited therein. In part because of pressures by the Association of Airline Pilots for an amendment clarifying the issue, the question arose again at the International Conference on Private Air Law at The Hague in September 1955 ("the Hague Conference"), where the debate continued. The vast majority of delegates took no stand on the issue but simply concluded that an amendment clearly limiting the liability of airline employees was advisable, if only to resolve the controversy.[8] As the delegate from Belgium stated, without the amendment "the whole benefit of the Convention could be put aside." Hague Minutes at 218. Accordingly a clarifying amendment, Article 25A,[9] which expressly stated that the liability limits applied to a carrier's servants or agents, was introduced and overwhelmingly adopted. As H. K. Beaumont of CITEJA explained shortly after the conclusion of the Hague Conference:
 
 
 33
 "The (Hague) Protocol includes an entirely new Article which has the effect of enabling a servant or agent, acting within the scope of his employment, to avail himself of the same limits of liability as those applicable to a carrier. Some experts have considered that the limits in Article 22 are already applicable to servants and agents, although the carrier alone is mentioned therein. Others contend that these limits are not applicable to servants or agents, who consequently can be sued separately in tort or delict without limit. In some cases, servants and agents are indemnified against such claims in their employment agreements. In such cases, the carrier, though himself not liable, might have to pay unlimited compensation on behalf of a servant or agent. The new Article 25A sets at rest doubts on this subject and regularizes the position."
 
 
 34
 Beaumont, The Warsaw Convention of 1929, as amended by the Protocol Signed at The Hague, on September 28, 1955, 22 J. Air L. & Comm. 414, 419 (1955).
 
 
 35
 In the present case the district court, while conceding that a debate had existed on the issue of whether the Convention's liability limits applied to a carrier's employees, nevertheless relied heavily upon the later refusal of the United States to ratify the Hague Protocol which contained, among other items, Article 25A. We believe this reliance on the part of the district court to be misplaced, since the refusal to ratify the Protocol was due to the United States' dissatisfaction with an entirely different aspect of the Protocol its failure to provide a sufficient increase in the liability limits rather than to its express application of these limits to a carrier's employees. The Warsaw Convention had limited the carrier's liability for each passenger to $8,300, to which the United States objected, Lowenfeld, Aviation Law, § 4.11 (1972), announcing that it would not agree to a limit of less than $25,000. A large majority of the delegations, by contrast, favored a $13,300 limit. A compromise was finally reached at $16,600, exactly double the Warsaw figure.
 
 
 36
 Although the United States signed the Hague Protocol, 10 years went by without the President of the United States or the Senate Foreign Relations Committee taking any firm stand on ratification. When a new Administration, many years later, recommended ratification coupled with domestic legislation requiring all American airlines to purchase insurance in the amount of $50,000 for each passenger in case of death, the plaintiffs' bar, airlines and insurance companies opposed the insurance aspect of the proposal. The situation was summarized by Najeeb Halaby, Administrator of the Federal Aviation Agency:
 
 
 37
 "(T)here are a lot of benefits in the Hague Protocol that are submerged in the discussion of the limitation of liability. . . . We like just about everything about the Hague Protocol except the doubling of the liability figure.
 
 
 38
 "The central defect in the Warsaw Convention is its low limit of liability. Opponents of the Warsaw system contend that the defect would exist even under its amendment by the Hague Protocol. However, it was our judgment that we should not forsake the major benefits of the Warsaw Convention solely on account of this defect but rather should strive to retain these benefits and at the same time alleviate to the extent possible the adverse impact of the monetary limitation." (Emphasis added)
 
 
 39
 Hague Protocol to Warsaw Convention: Hearings Before the Committee on Foreign Relations, 89th Cong., 1st Sess. on Exec.H., 86th Cong., 1st Sess. at 15, 19 (May 26-27, 1965) (hereinafter cited as "Hague Hearings"). The Committee recommended ratification, but only if the insurance legislation was enacted. S.Exec.Rep.No.3, 89th Cong., 1st Sess. 6-7 (1965). When it became evident that the insurance legislation stood no chance of passage, the Administration unsuccessfully attempted to induce the carriers to waive the liability limitation up to $100,000 under Article 22(1), which provides that "by special contract, the carrier and the passenger may agree to a higher limit of liability." Thereupon the United States gave formal notice of denunciation of the Convention, to become effective in six months time, but left open the possibility that it might be withdrawn if an interim waiver of liability limitations up to $75,000 per passenger were forthcoming from the airlines, pending a full-scale revision of the limits by international agreement up to $100,000.
 
 
 40
 At this point a conference was convened in Montreal to see if an acceptable compromise could be worked out. Intensive private negotiations led on Friday, May 13, 1966, to the withdrawal of the notice of denunciation and the execution of an agreement, known as the Montreal Agreement, which provided for absolute carrier liability up to $75,000 on all flights into or out of the United States. In all, over 150 carriers subscribed. See Lowenfeld, Aviation Law §§ 5.41-5.42 (1972). The Hague Protocol was never resubmitted to the Senate for ratification.[10]
 
 
 41
 As the somewhat convoluted history of attempted ratification of the Hague Protocol makes clear, the only reason for the United States' refusal to ratify it was its dissatisfaction with the low level of the carriers' liability limitations, not the other provisions of the Protocol. Indeed, the administration and the members of the Senate Foreign Relations Committee were willing to compromise on the carriers' liability limits in order to obtain the benefits of the remainder of the Protocol, including Article 25A, which the United States delegation had endorsed at the Hague Conference.
 
 
 42
 Thus the plain language of the original Convention, read according to the meaning that would ordinarily be given to the pertinent official French-language text, tends to support appellants' contention that its liability limits were intended to apply to a carrier's employees, with little or no further light on the issue being contributed by its legislative history, subsequent events, or decided cases.[11] That interpretation, moreover, although not necessarily according with common law principles, which separate the corporation and its employees for liability purposes, does reflect the legal principles of many civil law states, which treat the corporation and its employees as one.
 
 
 43
 There remains the question of whether the overall purposes of the Convention shed any light on the meaning to be given to the pertinent provisions before us, for it is fundamental that a treaty, whether construed strictly or liberally, should be interpreted to effectuate its evident purposes. Bacardi Corp. v. Domenech, 311 U.S. 150, 163, 61 S.Ct. 219, 85 L.Ed. 98 (1940); Factor v. Laubenheimer, 290 U.S. 276, 293-94, 54 S.Ct. 191, 78 L.Ed. 315 (1933); United States v. A.L. Burbank & Co., 525 F.2d 9, 12-14 (2d Cir. 1975); Board of County Commissioners v. Aerolineas Peruanasa, S.A., 307 F.2d 802, 806-07 (5th Cir. 1962). In interpreting the Warsaw Convention, we have consistently followed this basic principle. In Eck v. United Arab Airlines, Inc., 360 F.2d 804, 812 (2d Cir. 1966), for instance, we laid down general guidelines for the interpretation of the Convention, stating:
 
 
 44
 "A court faced with this problem of interpretation, or another problem like it, can well begin with an inquiry into the purpose of the provision that requires interpretation. The language of the provision that is to be interpreted is, of course, highly relevant to this inquiry but it should never become a 'verbal prison.' Other considerations, such as the court's sense of the conditions that existed when the language of the provision was adopted, its awareness of the mischief the provision was meant to remedy, and the legislative history available to it, are also relevant as the court attempts to discern and articulate the provision's purpose. The inquiry may lead the court to conclude that the provision's language accurately reflected its purpose; in such a situation the court is most faithful to the purpose if the language is interpreted literally. Conversely, the inquiry may lead the court to conclude that the language of the provision only imperfectly manifests its purpose, or that when the words were first chosen the language accurately reflected the provision's purpose but that today the same words imperfectly reflect this purpose because conditions have changed in the area to which the words of the provision refer. It would be inconsistent with the 'wise counsel to reject " the tyranny of literalness," ' if the court in the latter situations did not seek to interpret the provision so as to effectuate its purpose, even if this requires departing in some measure from the letter and reading the language in a practical rather than literal fashion." (Citations omitted).
 
 
 45
 See also Day v. Trans World Airlines, Inc., 528 F.2d 31, 36-37 (2d Cir. 1975); Lisi v. Alitalia-Linee Aeree Italiana, 370 F.2d 508, 512 (2d Cir. 1966), aff'd by divided court, 390 U.S. 455, 88 S.Ct. 1193, 20 L.Ed.2d 27, rehearing denied, 391 U.S. 929, 88 S.Ct. 1801, 20 L.Ed.2d 671 (1968); Noel v. Linea Aeropostal Venezolana, 247 F.2d 677, 679 (2d Cir.), cert. denied, 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262 (1957); Block v. Compagnie Nationale Air France, 386 F.2d 323, 336-37 (5th Cir. 1967), adopted and followed in Molitch v. Irish International Airlines, 436 F.2d 42, 43 (2d Cir. 1970).
 
 
 46
 It is beyond dispute that the purpose of the liability limitation prescribed by Article 22 was to fix at a definite level the cost to airlines of damages sustained by their passengers and of insurance to cover such damages. As Secretary of State Cordell Hull wrote in transmitting the Convention to the Senate in 1934:
 
 
 47
 "It is believed that the principle of limitation of liability will not only be beneficial to passengers and shippers as affording a more definite basis of recovery and as tending to lessen litigation, but that it will prove to be an aid in the development of international air transportation, as such limitation will afford the carrier a more definite basis on which to obtain insurance rates, with the probable result that there would eventually be a reduction of operating expenses for the carrier and advantages to travelers and shippers in the way of reduced transportation charges."
 
 
 48
 Senate Comm. on Foreign Relations, Message from the President of the United States Transmitting a Convention for the Unification of Certain Rules, Sen.Exec.Doc.No.G, 73d Cong., 2d Sess. 3-4 (1934).
 
 
 49
 The history of the Convention from the point of adherence by the United States to the present indicates no change in this fundamental purpose. It is true that as the airline industry has matured, safety records have improved and world-wide inflation has advanced, an increase in the amount of the limit has been required. Thus the Administration in 1965 proposed compulsory insurance in the amount of $50,000, and the Montreal Agreement raised the limits of liability to $75,000. Similarly, the Guatemala City Protocol, drafted at the insistence of the United States and still awaiting consideration by the Senate, would raise those limits (at the current exchange rate) to over $400,000.[12] Nevertheless, at no time has this country ever abandoned the basic principle that, whatever the limits may be, air carriers should be protected from having to pay out more than a fixed and definite sum for passenger injuries sustained in international air disasters.[13]
 
 
 50
 To permit a suit for an unlimited amount of damages against a carrier's employees for personal injuries to a passenger would unquestionably undermine this purpose behind Article 22, since it would permit plaintiffs to recover from the carrier through its employees damages in excess of the Convention's limits. This impact was recognized by Professor Drion prior to the Hague Conference when he urged that the interpretation presently sought by appellants be given to the Warsaw provisions:
 
 
 51
 "Any other solution would defeat the purpose of Article 24, which is to prevent claimants from avoiding the provisions of the Convention by suing the enterprise outside the contract of carriage."
 
 
 52
 H. Drion, Limitation of Liabilities in International Air Law 158 (1954). Virtually all delegates, whatever view they took on the question of whether the liability limits of the Warsaw Convention applied to a carrier's employees, agreed that unless the limits applied the Convention's pertinent provisions would be frustrated. See, e. g., Hague Minutes 218 (remarks of delegate from Greece), 218-19 (remarks of delegate from Canada), 219 (remarks of delegate from Spain), 353 (remarks of delegate from the United States), 360 (remarks of delegate from Australia). See also id. at 216 (remarks of delegate from Mexico), 218 (remarks of delegate from Belgium), 200 (remarks of delegate from Italy, Prof. Ambrosini), 221 (remarks of delegate from Portugal), 353 (remarks of delegate from the Netherlands, Prof. Drion), 361 (remarks of delegate from the United Kingdom), 361 (remarks of delegate from the Federal Republic of Germany, Prof. Riese).
 
 
 53
 Most carriers, at their employees' insistence, provide their employees with indemnity protection. The pressure for indemnification is attributable principally to the difficulty confronted by certain employees, such as pilots or their estates, in defending against personal liability, regardless of the amount claimed, in view of the common law presumption of liability created by the doctrine of res ipsa loquitur, see Lowenfeld, Aviation Law § 4.32, at VI-100 (1972), and the imposition of absolute liability under certain civil law systems.[14] It is inconceivable that airlines could long operate without reimbursing their employees for this cost of doing business.[15]
 
 
 54
 Faced with indemnification as a modern-day reality, our function, in the absence of proof that the language of Articles 22 and 24 was not intended to apply to a carrier's employees, should be to interpret these provisions in a manner that will carry out the framers' intent. As we stated in Day v. Trans World Airlines, Inc., supra, at 35:
 
 
 55
 "Those called upon to construe a treaty should, in the words of Judge Clark, strive to 'give the specific words of a treaty a meaning consistent with the genuine shared expectations of the contracting parties.' Maximov v. United States, 299 F.2d 565, 568 (2d Cir. 1962), aff'd 373 U.S. 49, 83 S.Ct. 1054, 10 L.Ed.2d 184 (1963). These expectations can, of course, change over time. Conditions and new methods may arise not present at the precise moment of drafting. For a court to view a treaty as frozen in the year of its creation is scarcely more justifiable than to regard the Constitutional clock as forever stopped in 1787. Justice Holmes' counsel concerning Constitutional construction, set forth in his opinion in Missouri v. Holland, 252 U.S. 416, 433, 40 S.Ct. 382, 383, 64 L.Ed. 641 (1920) applies with equal force to the task of treaty interpretation: '(W)hen we are dealing with words that are a constituent act . . . we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters.' "
 
 
 56
 Another fundamental purpose of the signatories to the Warsaw Convention, which is entitled to great weight in interpreting that pact, was their desire to establish a uniform body of world-wide liability rules to govern international aviation,[16] which would supersede with respect to international flights the scores of differing domestic laws, leaving the latter applicable only to the internal flights of each of the countries involved.[17] As Administrator Halaby of the FAA later stated before the Senate Foreign Relations Committee:
 
 
 57
 "The problem of finding one's way through this thicket of foreign laws would be extremely difficult for the individual, passenger, or shipper, an even greater problem for the large manufacturing company with many air shipments to different parts of the world, and an almost insuperable task for the airline which has to operate in or over great numbers of countries whose laws are foreign to that of its flag. The Warsaw Convention, by providing a uniform rule of law which governs the relationship of the airline operator and his passenger or shipper in all of these different situations has for almost 40 years provided a degree of certainty making it possible for the individual passenger or shipper and the airline operator to be reasonably certain what their legal relationship with each other is, and to act accordingly. We believe it of great importance to retain this uniformity by ratifying the Hague Protocol rather than denouncing the Warsaw Convention and subjecting our passengers, shippers, and airlines to the risks of widely varying local laws."
 
 
 58
 Hague Hearings at 20. A May 26, 1965, letter from the Civil Aeronautics Board to the Committee reflected the same sentiment:
 
 
 59
 "The major benefits of the (Warsaw) convention to passengers, shippers and carriers arise from the creation of a uniform body of substantive aviation liability law, applicable regardless of the place of injury, domicile of the passenger or shipper, or the nationality of the airline involved. Not only are the rights of recovery for passengers in the event of personal injury or death both assured and provided for in the convention, but the convention contains numerous provisions defining the respective rights of the consignor, consignee and carrier of air cargo, the legal effect of the air waybill, and provision for liability of the initial carrier in situations where the goods are shipped by several carriers. These provisions of substantive law are applicable to all claims wherever and however brought, and protect the claimant from provisions of foreign law or exemplary clauses in the ticket which tend to relieve the carrier from liability, fix a lower limit of liability from that provided for in the convention, or otherwise infringe upon the rules laid down by the convention.
 
 
 60
 "In the absence of the convention, a claimant could be subject to a maze of conflicting principles of conflicts of laws. The discovery and proof of appropriate law to be applied in cases where accidents occur in foreign jurisdictions presents one of the most difficult problems lawyers must face."
 
 
 61
 Hague Hearings at 42.
 
 
 62
 Today, as aircraft have grown larger and international transportation more commonplace, problems inherent whenever the uniform provisions of the Convention do not apply have grown manyfold. A good example of the "judicial nightmare," Forsyth v. Cessna Aircraft Co., 520 F.2d 608 (9th Cir. 1975), that could result is In re Paris Air Crash of March 3, 1974, 399 F.Supp. 732 (C.D.Cal.1975), involving 203 suits by 337 decedents primarily against the aircraft manufacturer for defective design, arising out of the crash of an American-built plane owned by Turkish Air Lines shortly after takeoff in France.[18]
 
 
 63
 Confronted with the prospect of a jungle-like chaos unless a uniform system of liability rules governing fundamental aspects of international air disaster litigation was devised, the framers of the Convention proceeded to draft a treaty which laid down uniform rules as to venue (Article 28), burden of proof (Article 20), standards of negligence (Articles 20 & 25), presumptions (Articles 18(3) & 26), contractual liability limitations (Article 23), suits against the estate of the tortfeasor (Article 27), statute of limitations (Article 29), liability in the event of carriage by more than one carrier (Article 30), and damage awards (Articles 22 & 25). In the five instances where the law of the forum is to apply, the rules so state explicitly. See Sundberg, Air Charter: A Study in Legal Development 242 (Stockholm 1961); Article 21 (contributory negligence), Article 24(2) (standing of and allocation among survivors), Article 25 (fault equivalent to dol ), Article 28 (procedure), and Article 29 (running of the statute of limitations).
 
 
 64
 The district court's decision, forsaking one uniform rule governing the limits of employee liability, would raise the very real prospect that in future international air disaster cases the plaintiffs would seek to circumvent the Convention's limitation by bringing suit against the pilot or some other employee of the airline involved, thus requiring the court to determine what domestic law applies and whether under that law recovery might be had for an amount greater than that recoverable against the airline. Indeed, in one lawsuit just commenced in New York seeking.$4.5 million for the death of a passenger killed in the recent collision of two Boeing 747 planes in the Canary Islands, the plaintiffs have taken the cue from the district court's decision here and joined one of the pilots as a co-defendant. If this method of circumventing the Convention's liability limitation is accepted, not only will the purpose of defining the limits of the carrier's obligations be circumvented, but in the process the Convention's most fundamental objective of providing a uniform system of liability and litigation rules for international air disasters will be abandoned as well. It is difficult to imagine an interpretation more at odds with the acknowledged purposes of the Convention than that for which appellees press. We believe, on the other hand, that a construction of the language of Article 22(1) and 24 which extends the Convention's liability limitation to passenger claims against employees not only reflects the plain meaning and purpose of the French text of these articles but accomplishes all of the Convention's objectives.
 
 
 65
 We find no merit in the remaining arguments advanced in support of the district court's interpretation of the liability limitation provisions of the Convention. The fact that the Convention in a few places refers not only to the carrier but to its agents is not inconsistent with our interpretation of Article 24(1), which, referring neither to a carrier nor to its agents, applies the limits without any qualification to "any action for damages, however founded." The Supreme Court's decision in Robert C. Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959), holding that § 4(5) of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1304(5), which limits the liability of an ocean carrier to $500 per package of cargo in the absence of a stated value in the bill of lading, does not limit the liability of an independent stevedoring company, is clearly distinguishable. COGSA, unlike the Convention, explicitly defines the term "carrier," and its definition does not include independent stevedoring companies. 46 U.S.C. § 1301(a). Moreover, COGSA, unlike the Convention, must be read against the common law and contains no requirement that "any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention." In addition, there is no evidence that carriers governed by COGSA (unlike those governed by the Convention) are ever called upon to reimburse independent stevedoring companies for the negligence of the stevedoring companies' employees. The Court's interpretation of COGSA, therefore, unlike the interpretation of the Convention that appellees request here, operates in no way as a circumvention of carrier liability limits. Finally, Herd did not reverse a 40-year international course of practice, as appellees would have us do here. We therefore find the analogy unpersuasive.
 
 
 66
 Appellees argue that the Convention should not be enforced because it is now antiquated, pointing out that the airline industry is no longer in its infancy or "in need of special protection," that the $75,000 limit is "unconscionably low," that it is "arbitrary and inadequate," that "Warsaw is not vital to our foreign policy," and that "(a)s for the diplomatic problems that might be encountered, they can easily be overcome."[19] These arguments misconceive our function. We do not sit to decide whether laws are no longer necessary or to assess the diplomatic consequences of their abandonment. The Warsaw Convention is not a treaty that has mouldered on the books. On the contrary it has had agonizing reappraisal by the Executive and Legislative branches, without any denunciation on the part of the Executive branch or modification by Congress through adoption of superseding domestic laws, see Diggs v. Shultz, 152 U.S.App.D.C. 313, 470 F.2d 461, 466 (1972), cert. denied, 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973). Our duty is to enforce the Constitution, laws, and treaties of the United States, whatever they might be, and until one of our sister branches declares otherwise, the Warsaw Convention remains the supreme law of the land. Smith v. Canadian Pacific Airways, Ltd., 452 F.2d 798, 801 (2d Cir. 1971).
 
 
 67
 Accordingly, we hold that plaintiffs may not recover from an air carrier's employees or from the carrier and its employees together a sum greater than that recoverable in a suit against the carrier itself as limited by the Warsaw Convention with its applicable agreements and protocols. The order of the district court is reversed with instructions to reinstate defendants' defense based on that Convention.
 
 
 
 [1]
 Convention for the Unification of Certain Rules Relating to International Transportation by Air, opened for signature Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11 (adherence of United States proclaimed Oct. 29, 1934)
 
 
 [2]
 Agreement Relating to Liability Limitations of the Warsaw Convention and the Hague Protocol, Agreement CAB 18990, approved by order E-28680, May 13, 1966 (docket 17325)
 
 
 [3]
 See Smith v. O'Donnell, 215 Cal. 714, 12 P.2d 933 (1932); Seaman v. Curtiss Flying Serv., Inc., 231 App.Div. 867, 247 N.Y.S. 251 (1930); Lowenfeld, Aviation Law § 4.32 (1972)
 
 
 [4]
 See, e.g., Civil Code art. 1384, para. 1 (Fr.); Judgment of Nov. 12, 1952, Cour d'appel, Paris, (1953) J.C.P. II 7650; Judgment of Oct. 11, 1954, Cour d'appel, Bordeaux, (1955) D.Jr. 32; Judgment of April 7, 1956, Cour d'appel, Paris, (1956) J.C.P. II 9453
 
 
 [5]
 In order to ensure uniformity of interpretation, which was one of the paramount objectives of the Convention, the text was "drawn up in French in a single copy." Article 36. See Block, infra at 330; Day v. Trans World Airlines, Inc., 528 F.2d 31, 33 n.7 (2d Cir. 1975); Eck v. United Arab Airlines, Inc., 360 F.2d 804, 814 (2d Cir. 1966)
 
 
 [6]
 The English version that was used by the Senate was originally published in a Treaty Information Bulletin of the Department of State in March 1934. 78 Cong.Rec. # 115 77-82 (1934)
 
 
 [7]
 As Judge Wisdom stated in Block, 386 F.2d at 331, "much of the difference in views among the jurists on Citeja and the delegates to Warsaw is attributable to the conceptual differences in the laws of France, Italy, Germany, and the Scandinavian countries, to say nothing of the difference between the civil law and the common law." He added:
 "The binding meaning of the terms is the French legal meaning. 'The principle of the primacy of the French legal system thus means a harmonizing construction of the Convention.' This principle should not be carried to extremes, but '(u)niformity may be maintained without many futile disputes as to whether, why, and when resort to the teachings in Paris should be made.' The necessity for maintaining uniformity, even when the Convention is applied in a country, such as the United States, having a doctrinal basis for its legal system different from civilian systems, compels a broad construction of the Convention." Id. at 330.
 
 
 [8]
 In recommending such an amendment, the Legal Committee of the International Civil Aviation Organization referred to
 "the possibility that efforts might be made by claimants to obtain from the carrier higher damages than those specified in the Convention by filing actions against the servant or agent of the carrier, upon the basis that no provision existed in the Convention limiting the liability of the servant or agent and upon the assumption that the carrier would indemnify such servants or agents."
 Report on Revision of the Warsaw Convention, 2 International Conference on Private Air Law, The Hague, Sept. 1955, Documents 99 (ICAO Doc. 7686-LC/140 1956) (emphasis added). We read this statement as referring to continuing uncertainty as to the proper scope of the Convention. As the Swiss delegation stated:
 "Mr. Stalder (Switzerland) stated that the Swiss Delegation saw no necessity for amending the Convention by an Article 25A. However, in order to assist the court which would have to pass judgment on cases now carefully regulated by this article, he was prepared to accept it."
 Hague Minutes at 216.
 
 
 [9]
 Article 25A provides:
 "1. If an action is brought against a servant or agent of the carrier arising out of damage to which this Convention relates, such servant or agent, if he proves that he acted within the scope of his employment, shall be entitled to avail himself of the limits of liability which that carrier himself is entitled to invoke under Article 22.
 "2. The aggregate of the amounts recoverable from the carrier, his servants and agents, in that case, shall not exceed the said limits.
 "3. The provisions of paragraphs 1 and 2 of this article shall not apply if it is proved that the damage resulted from an act or omission of the servant or agent done with intent to cause damage or recklessly and with knowledge that damage would probably result."
 
 
 [10]
 A detailed history of the Hague ratification controversy appears in Lowenfeld, The United States and the Warsaw Convention, 80 Harv.L.Rev. 497 (1967). Mr. Lowenfeld was Chairman of the United States delegation at the Montreal Conference
 
 
 [11]
 To the extent that the decided cases indicate anything, they would tend to support, on balance, the conclusion that employees should be covered. In Wanderer v. Sabena, 1949 U.S. Aviation Rep. 25 (Sup.Ct.N.Y.Co.1949), the court held that agents were protected by the liability limits. Following Wanderer, the court in Chutter v. KLM, 132 F.Supp. 611 (S.D.N.Y.1955), also held that the Convention protects agents. In 1957, the court in Pierre v. Eastern Airlines, Inc., 152 F.Supp. 486 (D.N.J.1957), apparently unaware of Wanderer and Chutter and relying on the failure of this country to ratify the Hague Protocol, held that the defendant pilot was not protected even though his co-defendant and employer Eastern Airlines was. The ultimate disposition of this case was unclear. (Appellants assert that the case was not appealed and was settled for a nominal amount. Amicus asserts that the nominal sum was greater than that permitted by the Convention.) In 1961, a Canadian trial court ruled that the Carriage by Air Act, which embodied the Warsaw Convention in Canada, did not limit the liability of the estates of employee-pilots. Stratton v. Trans Canada Airlines, 27 D.L.R.2d 670 (B.C.Sup.Ct.1961). The Court of Appeals held that the flight was not "international" for purposes of the Convention, so that the limitations of the Convention did not apply, and that in any event any cause of action against the pilots did not survive their deaths, and therefore concluded that "it is not necessary to consider whether the pilots would have been entitled to its benefits had it been applicable to the flight in question." Stratton v. Trans Canada Airlines, 32 D.L.R.2d 736, 749 (B.C.Ct.App.1962)
 The parties and amicus curiae cite in addition Scarf v. Trans World Airlines, Inc., 4 Av.L.Rep. (CCH) 17,828 (S.D.N.Y.1955); Hoffman v. British Overseas Airways Corp., 9 Av.L.Rep. (CCH) 17,180 (N.Y.Sup.Ct.1964); and Judgment of Dec. 3, 1969, Cass.Crim., France (1970) D.S.Jur. 81. In Scarf, no allegations of agency were made, and the court distinguished Chutter on that basis. In Hoffman, the court refused to dismiss for improper venue a suit against an airport portable stairway company where the company refused to concede jurisdiction over the claim in any other court, distinguishing Chutter as not dealing with venue problems. Why amicus curiae cites the French case, Judgment of Dec. 3, 1969, in support of its position is something of a mystery, since France ratified the Hague Protocol prior to that decision. In any event, the case involved the jurisdictional peculiarities of the French action civile, in which criminal and civil liabilities are assessed simultaneously against an alleged wrongdoer in this case the pilot. The court upheld a motion to dismiss the adjoined suit against the employer carrier for lack of venue under the Warsaw Convention. No motion was made to dismiss the civil half of the action civile, and no consideration was given by the court to problems that might be involved in doing so.
 Thus, with the possible exception of Pierre, to our knowledge there has never, during the entire 40-odd years of the Convention, been a Warsaw case in any country in which a plaintiff has obtained, by suing the carrier's employees instead of the carrier itself, more than the sum for which the carrier itself would be liable under the Convention as modified by applicable protocols and agreements.
 
 
 [12]
 In 1971 the Guatemala City Protocol instituted a system of absolute carrier liability regardless of fault, and raised the liability limits to about $100,000 at the then-current exchange rate of $35 per ounce of gold. (Under the Protocol, calculation of the limit is to be made "according to the gold value of (the dollar) at the date of the judgment." See Article VIII). As of March 22, 1977, the price of gold was $152 per ounce, which, according to our calculations, implies a liability limit of $480,147
 
 
 [13]
 Except, of course, in the event of proof of "wilful conduct." Article 25
 
 
 [14]
 See note 4, supra. Thus the estate of the pilot of the Douglas DC-10 that crashed shortly after takeoff from Paris, France, on March 3, 1974, see In re Paris Air Crash of March 3, 1974, 399 F.Supp.732 (C.D.Cal.1975), would be absolutely liable for the death of all 333 passengers on board, despite the pilot's lack of negligence or fault
 
 
 [15]
 Here, plaintiffs demand a total of $8,600,000 on behalf of 9 out of the 79 passengers on board. As the amicus brief notes, the case on appeal is the test case for the remainder of the suits consolidated with it below
 
 
 [16]
 The preface to the Convention states that the parties "Having recognized the advantage of regulating in a uniform manner the conditions on international transportation by air in respect of the documents used for such transportation and of the liability of the carrier" have entered into the Convention thereafter set forth. See also Grein v. Imperial Airways, Ltd., (1937) 1 K.B. 50, 74-75; Rosman v. Trans World Airlines, Inc., 34 N.Y.2d 385, 395-96, 358 N.Y.S.2d 97, 314 N.E.2d 848 (1974); W. E. Astle, Air Carriers' Cargo Liabilities and Immunities 20 (London 1958); Warsaw Minutes at 136 (statement of the delegate from France)
 
 
 [17]
 See Letter of June 30, 1925, from M. Briand, Ministre des Affaires Etrangeres, reprinted in Conference Internationale de Droit Prive Aerien 1929 (Warsaw Proceedings) at 10. See also Avant-Projet de Convention Internationale sur la Responsabilite du Transporteur par Aeronefs, reprinted id. at 10-11
 
 
 [18]
 The court stated:
 "The decedents were from 24 countries, and at least 12 states of the United States were represented among the suits filed a total of 36 jurisdictions. According to information furnished voluntarily by THY, the human occupants of the plane came from the following countries: Argentina, Australia, Belgium, Brazil, Canada, Cyprus, Denmark, England (United Kingdom), France, India, Northern Ireland (United Kingdom), Republic of Ireland, Italy, Japan, Morocco, New Zealand, North Korea, Pakistan, Senegal, South Viet Nam, Switzerland, Turkey, United States, and West Germany. (Claimants are from all of these countries plus Israel and Sweden.) So far, it presently appears to the Court that claimants are from the states of California, Indiana, Kansas, Maryland, New Jersey, New York, Pennsylvania, South Carolina, Texas, Utah, Virginia, and Washington. How many countries are actually involved as to either claimants or decedents neither the Court nor his staff has had time to tabulate, and accurate and complete information has not been supplied to the Court by the parties.
 "The complexity of the problem of the choice of law applicable to damages is further illustrated by some facets of the distinctions in the conflicts rules of the 12 states listed above: Five of them use the 'significant contacts' (state-with-substantial-ties-to-a-transaction) approach, sometimes interchangeably with 'government-interest' or 'public-interest' approach; six apply the 'place-of-the-wrong,' i. e. accident, approach; and California specifically uses the 'governmental-interest' approach . . . .
 "The measures of damages recoverable also varies: One state limits the amount to $50,000; another, to $75,000; four allow full recovery with varying limitations; one has full recovery plus pain and suffering and mental anguish; and five use 'compensatory' and, in some instance, 'pecuniary.'
 "No standard or rules for choice of law on damages (where there may be a conflict) of any of the foreign nations involved has been cited to the court by the parties, and none has been found on independent research, although the parties have set forth the elements of the measure of damages in death cases in some, but by no means all, of the countries involved."
 
 
 [399]
 F.Supp. at 741-42
 
 
 [19]
 In addition, the district court argued that the Convention ought to be strictly construed because adherence by the United States was not "prompt," "enthusiastic," or "exuberant." Under the same principle, presumably, a statute that barely passed Congress would be strictly construed, while a bill passed by a wide majority would deserve an expansive interpretation. We cannot endorse any such principle. As the Supreme Court stated in Chicago, Burlington & Quincy R.R. Co. v. McGuire, 219 U.S. 549, 569, 31 S.Ct. 259, 263, 55 L.Ed. 328 (1911) (emphasis added):
 "Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance."