Mrs. Helen KABBANI, Plaintiff,

v.

INTERNATIONAL TOTAL SERVICES,
Defendant.

Civ. A. No. 91–0391–LFO.

United States District Court,
District of Columbia.

Oct. 15, 1992.

Martin F. McMahon, Malea Kiblan, Law
Offices of Martin F. McMahon, Washington, D.C., for plaintiff.

Mark A. DomBroff, Judith K. Rayner,
Alan B. Havis, Katten, Muchin, Zavis &
DomBroff, Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiff, Helen Kabbani, seeks damages
from defendant for negligence and willful
misconduct resulting in the theft of her
purse at an airline security checkpoint at
Dulles International Airport. Defendant,
International Total Services, Inc. (ITS), provides baggage search and passenger inspection services by contract to individual
airlines at Dulles. This matter comes before the court on defendant's motion to
dismiss or in the alternative to strike all
claims inconsistent with the Warsaw Con-

vention.[1] Pursuant to the parties' agreement at a hearing on July 22, 1992, this motion, and plaintiff's opposition, shall be treated as defendant's partial motion for summary judgment.

The question before the court at present is whether an independent contractor, when providing legally required security services to passengers boarding an international flight, is subject to the liability limitations of the Warsaw Convention for baggage thefts. Because plaintiff's bag was in defendant's charge at the time of the alleged theft, and because defendant was acting as the carrier's agent in providing security services the airline otherwise legally would have been required to provide, the Warsaw Convention applies to the circumstances challenged here and provides the exclusive remedy in this case. Accordingly, defendant's motion for partial summary judgment is granted.

## I. BACKGROUND

By law, all international airlines are required to provide security checks of embarking passengers and their baggage. 49 U.S.C.App. § 1356.[2] Defendant ITS provides these services at Dulles International Airport as an independent contractor under agreements with the individual airlines. Under the ITS contract with Air France, the airline in question here, each party indemnifies the other for all liability for losses resulting from that party's own negligence during the provision of contracted services. Def. Ex. 3, Agreement for Baggage Search and Passenger Inspection Services at Washington Dulles International Airport, § 6 ("the contract"). ITS maintains insurance to cover this liability.

Plaintiff Kabbani occasionally travels to Syria for cleaning and repair of her family jewelry. She alleges that on October 9, 1989, she went to Dulles Airport to embark on one such journey, traveling to Paris via Air France. In her travel bag, she carried her purse, which contained jewels with an alleged value of several hundred thousand dollars. Plaintiff alleges that while she was passing through the metal detector at the ITS security checkpoint, the ITS agent obstructed Kabbani, resulting in the theft of her purse from the x-ray machine by another ITS agent. The purse and jewels were never recovered, though plaintiff's passport and other articles later were mailed anonymously to the State Department.

Plaintiff sues ITS for reckless and willful misconduct in employing and supervising its employees and for breach of ITS's security contract with Air France. She seeks $1.5 million in compensatory and $1 million in punitive damages. The Warsaw Convention was not mentioned in plaintiff's complaint or in defendant's answer, and discovery proceeded under the aforementioned claims.

Less than four months after plaintiff's Complaint was filed and prior to the end of discovery, defendant notified plaintiff of its intention to introduce the Warsaw Convention as a defense. Defendant now seeks to dismiss the Complaint for failure to state a cause of action, to strike all claims inconsistent with the Convention, or in the alternative, to amend its answer to assert the Warsaw Convention's damage limitations as plaintiff's exclusive remedy.

## II. THE WARSAW CONVENTION

The Warsaw Convention was adopted following two international negotiating conferences in Paris in 1925 and in Warsaw in 1929. It is undisputed that the fundamental purpose of the Convention was to create uniform liability rules around the world governing international travel and to limit the liability of air carriers. *E.g. Reed v.*

1. Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934); 49 U.S.C.App. § 1502 note.

2. 49 U.S.C.App. § 1356(a) provides that the Administrator shall promulgate regulations requiring that

all passengers and all property intended to be carried in the aircraft cabin in air transportation or intrastate air transportation be screened by weapon-detecting procedures or facilities employed or operated by employees or agents of the air carrier ... prior to boarding the aircraft for such transportation.

*Wiser*, 555 F.2d 1079, 1089–90 (2d Cir. 1977). By superseding the myriad emerging domestic laws and setting limits on air carrier liability, the contracting nations sought to establish a "stable, predictable, and internationally uniform limit that would encourage the growth of a fledgling industry." *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 256, 104 S.Ct. 1776, 1784, 80 L.Ed.2d 273 (1984). Thus, the Convention reflects a calculated compromise, imposing strict liability on air carriers for losses and injuries occurring in international travel, while limiting the amount the injured party may recover. *Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256, 1258 (9th Cir.1977).

Article 24 of the Convention provides that suits for damage to baggage covered by Articles 18 and 19, "can only be brought subject to the conditions and limits set out in this convention." Art. 24(1). Courts have disagreed regarding whether the Warsaw Convention therefore creates "the universal source of a right of action." *Benjamins v. British European Airways*, 572 F.2d 913, 919 (2d Cir.1978). *Compare Floyd v. Eastern Airlines, Inc.*, 872 F.2d 1462, 1482 n. 33 (11th Cir.1989); *Tokio Marine and Fire Ins. Co. v. McDonnell Douglas Corp.*, 617 F.2d 936 (2d Cir.1980). Some courts, for example, have held that state law claims may arise under the Convention. *See Alvarez v. Aerovias Nacionales de Colombia, S.A.*, 756 F.Supp. 550 (S.D.Fla.1991). Nevertheless, it universally is agreed that the Convention creates the exclusive *remedy* for injuries falling within its scope, unless the injured party can demonstrate willful misconduct on the part of the carrier. *Alvarez v. Aerovias Nacionales*, 756 F.Supp. at 555; *In re Korean Air Lines Disaster*, 664 F.Supp. 1463 (D.D.C.1985). Where willful misconduct is established, the injured party is entitled to compensatory damages at fair market value. Punitive damages, however, are not recoverable in actions governed by the Warsaw Convention, *In re Air Disaster at Lockerbie*, 928 F.2d 1267 (2d Cir.1991); *In re Air Crash Disaster at Gander*, 684 F.Supp. 927 (W.D.Ky.1987), even where plaintiffs are able to demonstrate willful misconduct. *Harpalani v. Air–India, Inc.*, 634 F.Supp. 797 (N.D.Ill.1986).

Two questions must be examined to determine the applicability of the Warsaw Convention to this case. First, would the loss at issue fall within the Convention's liability limitations if the security check had been conducted directly by the carrier? And second, does defendant's relationship to Air France allow defendant to invoke the Convention in its own defense? Courts in other jurisdictions have examined aspects of these questions. *See Reed v. Wiser*, 555 F.2d 1079; *Baker v. Lansdell Protective Agency, Inc.*, 590 F.Supp. 165 (S.D.N.Y. 1984). Neither question previously has been addressed in this circuit, however, and in this jurisdiction the questions are ones of first impression. Each will be addressed in turn.

### III. APPLICABILITY OF THE CONVENTION

Article 22 of the Warsaw Convention establishes liability limitations for three categories of injuries and losses. Sections one and two of the Article address air carrier liability to passengers, Art. 22(1), and liability for "checked baggage." Art. 22(2). Article 22(3) establishes liability for carry-on baggage, or "objects of which the passenger takes charge himself," and limits such liability to 5,000 French francs per passenger.

Articles 22(2) and 22(3) regarding checked and carry-on baggage are further elaborated upon in Article 4, which requires that "[f]or the transportation of baggage, *other than small personal objects of which the passenger takes charge himself,* the carrier must deliver a baggage check." Art. 4(1) (Emphasis added). Article 4(4) further provides that "if the carrier accepts baggage without a baggage check having been delivered" the liability limitations of the convention regarding checked baggage do not apply, and the carrier therefore is fully liable for any injury or loss.

Thus, "checked baggage" in the meaning of Article 22(2) and Article 4 refers to

baggage in the carrier's charge for which the carrier has provided a baggage receipt. Both conditions must be met for that provision's liability cap to apply. Carry-on baggage as described in Articles 22(3) and 4(1) does not require a baggage check and is presumed to remain in the passenger's control. Plaintiff Kabbani's jewels were in her carry-on baggage at the time of the alleged theft. Therefore, Article 22(3) regarding "objects of which the passenger takes charge himself" establishes the Convention's liability cap in this case if the Convention otherwise is applicable to defendant.

In order to determine whether the recovery limitation in Article 22(3) is applicable to the facts at issue, the *scope* of the carrier's liability for carry-on baggage also must be determined. Here, the treaty on its face is less helpful. Article 22 creates three different categories of liability limits—for passengers, checked baggage, and carry-ons. The treaty, however, contains only two provisions addressing the circumstances under which carrier liability for these categories is incurred. Article 17 limits the scope of air carrier liability for injuries to *passengers* to events occurring in flight or during "any of the operations of embarking and disembarking." Art. 17. Courts have construed "embarking and disembarking," to turn either on the passenger's physical location, *see MacDonald v. Air Canada*, 439 F.2d 1402 (1st Cir.1971); *In re Tel Aviv*, 405 F.Supp. 154 (D.C. Puerto Rico 1975), or more broadly on "whether the passenger's *actions* were a part of the operation or process of embarkation." *Day v. Trans World Airlines, Inc.*, 528 F.2d 31, 33 (2d Cir.1975). Courts explicitly acknowledge that this clause does not impose liability on international carriers for all injuries to passengers occurring within an airport.[3]

Article 18(1) of the Convention, on the other hand, provides that carriers are liable for "checked baggage or any goods" "if the occurrence which caused the damage . . . took place during the transportation by

air." Transportation by air is defined as the period during which the baggage is "in charge of the carrier, whether in an airport or on board an aircraft." Art. 18(2). The treaty thus creates a different standard of liability for checked baggage, for which the carrier is liable at any time while the bag is in the carrier's charge, Art. 18, and for passengers, to whom the carrier is liable only during flight and in the process of "embarking and disembarking." Art. 17. *See In re Tel Aviv*, 405 F.Supp. 154.

Neither Article 17 nor Article 18, however, directly addresses the question of when the carrier is responsible for injuries or losses to carry-on baggage. Article 22(3) indicates clearly that the Convention includes liability for carry-on baggage within its scope. But neither Article 17 nor Article 18 specifically indicates the extent of air carrier liability for such non-checked baggage.

Few courts have addressed the question of when the Convention's limitation on liability for carry-on baggage is triggered. In *Baker v. Lansdell Protective Agency*, 590 F.Supp. 165, the Southern District examined the alleged theft of a purse containing $200,000 in jewelry at an airport security check, under facts almost identical to those presented here. That court noted that neither Article 17 nor Article 18 explicitly governed carrier liability for carry-on baggage. The court held that Article 17's "embarking and disembarking" standard most appropriately applied. The court further found that passage through an airport security check did constitute an "embarkation" within the meaning of Article 17, allowing the defendant security company to invoke the Convention in its defense.

In concluding that Article 17 appropriately defined the scope of carrier liability over carry-on baggage, the *Baker* court reasoned as follows:

> [B]ecause it is envisioned that these [carry-on] objects will ordinarily be within the passenger's possession or control, it

---

**3.** The drafters of the Convention rejected language explicitly extending the Convention's liability coverage over passengers to all events occurring within the airport terminal. *Day v. Trans World Airlines, Inc.*, 528 F.2d at 35.

is both logical and consistent with the Convention's overall framework to interpret the scope of the Convention's applicability to these items as being coextensive with its coverage of injuries to the person ... The Convention must be read as applying only to the loss of or damage to these personal items which occurs on board the aircraft or in the course of any of the operations of embarking or disembarking.

*Id.* at 167–68. Concededly, Article 17 most reasonably defines the scope of carrier liability over carry-on baggage in most situations, since carry-on baggage ordinarily does remain in the passenger's control. It would be illogical, in such circumstances, to create a standard for carrier liability to the passenger different from the standard applicable to the bag in the passenger's hand. The analysis is inappropriate, however, for situations such as that presented here, where the defendant temporarily did take "charge" of plaintiff's bag.

The crucial fact in this case is that plaintiff relinquished control over her bag, even if temporarily, by allowing it to pass separately through the x-ray machine. Although she did so voluntarily, plaintiff would have been instructed to place her bag on the x-ray belt by the ITS employee had she attempted to retain possession. Indeed, she would have been required to do so before she was allowed to board her flight. Plaintiff therefore relied on defendant to protect the bag as she passed through the security check metal detector. Plaintiff's Complaint confirms that she tendered "her precious valuables, her passport, cash and plane tickets to the Defendant." Complaint ¶ 49. Under these circumstances, defendant assumed charge of plaintiff's bag, and in contrast to the *Baker* court's conclusion, I find that Article 18 more appropriately applies.

Treaties are to be construed "in a broad and liberal spirit." *Asakura v. Seattle,* 265 U.S. 332, 342, 44 S.Ct. 515, 517, 68 L.Ed. 1041 (1924). The Warsaw Convention's terms, in particular, must be construed broadly to advance its goals. *See Benjamins v. British European Airways,* 572 F.2d at 918; *Julius Young Jewelry*

*Mfg. Co. v. Delta Air Lines,* 414 N.Y.S.2d 528, 67 A.D.2d 148 (1979). Under Article 18, when the carrier takes charge of checked baggage or goods, the carrier is liable for events occurring anywhere in the aircraft. Liability is not limited to Article 17's embarking and disembarking requirement. Therefore, where the carrier takes possession of the carry-on baggage of a passenger "during the course of transportation by air," the broader liability obligations established in Article 18 apply. The carrier becomes strictly liable for loss or damage to a carry-on bag in its charge whether the bag is in the airport or on the aircraft.

The conclusion that under these circumstances, Article 22(3), concerning carry-on baggage, should be read in conjunction with Article 18 is further supported by the treaty's structure. Section 22(1) relating to passengers is read in conjunction with Article 17. Section 22(2) regarding checked baggage is read together with Article 18. Section 22(3), dealing with baggage as well, albeit carry-on baggage, also is more logically read in conjunction with Article 18 when the bag is in the carrier's charge.

Plaintiff argues that Article 18 cannot apply to these circumstances, since plaintiff's bag was not "checked baggage" within the meaning of the Convention. Courts previously have construed Article 18 as applying only to checked baggage for which a baggage receipt has been issued. *See Martin v. Pan American World Airways, Inc.,* 563 F.Supp. 135 (D.D.C.1983). Failure to provide a baggage check for checked baggage therefore vitiates the liability limitations of the Warsaw Convention. *Gill v. Lufthansa German Airlines,* 620 F.Supp. 1453 (E.D.N.Y.1985).

The *Baker* court cited this requirement as a primary ground for preferring Article 17 over Article 18 as defining the scope of liability for unchecked baggage. To hold Article 18 applicable, it argued, "would require a carrier to provide a baggage check for each item it subjects to a brief, preboarding x-ray examination in order to retain its liability protection under the Con-

vention." *Baker*, 590 F.Supp. at 618. Another district court concluded that when the carrier removes carry-on baggage from a passenger's control during flight, without providing a claim check, the liability limitations of the Convention do not apply. *Hexter v. Air France*, 563 F.Supp. 932 (S.D.N.Y.1982).

I agree that requiring air carriers to provide baggage checks for every item examined at a security check would be onerous. This formalistic result is not required by the treaty, however. Article 4(4) only requires a claim check for "checked" baggage. Nothing in the treaty requires, or even addresses, the question of whether a claim check is required when the carrier takes temporary charge of a carry-on bag without checking it. In fact, Article 4(1) suggests quite to the contrary, that so long as a bag is not formally "checked," a baggage receipt for "objects of which the passenger takes charge himself" is not required.

The question of whether Article 17 or Article 18 defines the *scope* of carrier liability over carry-on baggage in the carrier's charge, furthermore, is entirely separate from the question of when a bag is checked and thereby requires a claim check. The treaty is altogether silent on this issue. There is no indication the drafters even contemplated that unchecked carry-on baggage might fall into the carrier's charge. Neither Article 17, regarding passenger liability, nor Article 18, regarding checked baggage, addresses the issue. Certainly, however, nothing in Article 18 precludes its being read to include carrier liability for unchecked baggage in the carrier's charge. The circumstances presented here fall much more readily within the scope of that

clause. Thus, Article 18 defines the scope of carrier liability when the carrier takes charge of unchecked carry-on bags. The fact that plaintiff Kabbani was not given a claim check when defendant took responsibility for her bag at the security check does not preclude defendant from invoking the Convention's liability limitations.[4]

 The treaty's ambiguity regarding the scope of carrier liability for carry-on baggage accordingly is resolved as follows. Where the passenger is in charge of the carry-on item, the passenger must be in the process of embarking or disembarking, consistent with Article 17, for the liability limitations of Article 22(3) to apply. Where, however, the carrier takes charge of the carry-on item but does not check it, Article 22(3)'s liability limitations are applicable, under Article 18, so long as the loss or injury occurs in the airport or on the aircraft. No claim check is required. Because defendant did take charge of plaintiff's carry-on bag and because the alleged event occurred in the airport, the Convention is applicable to the facts at issue, regardless of whether plaintiff was "embarking or disembarking."[5]

## IV. THE AGENCY OF DEFENDANT

Having concluded that the Convention would apply to the circumstances in this case if the bag had been in the carrier's possession, it remains to be determined whether defendant ITS also is entitled to the Convention's protection. This determination turns, first on whether the Convention applies to agents of a carrier, and second, whether defendant in fact acted as Air France's agent in this case. Both questions are resolved in the affirmative. The

---

**4.** The fact that plaintiff's bag was not "checked" but remained carry-on baggage and that no claim check was provided, however, means that her bag did not become "checked baggage" within the meaning of the Convention. The recovery limits in Article 22(2) for "checked baggage" therefore are not applicable to this case, and plaintiff remains subject to the recovery limitations for carry-on baggage established in Article 22(3).

**5.** Although Article 18 is applied here, the facts in this case indicate that the Warsaw Conven-

tion also would be applicable under the narrower liability obligation imposed by Article 17, as applied in *Baker*. This is true because passage through the security checkpoint is a legally mandated and integral part of the embarkation process. Regardless of which Article is used to define the *scope* of the carrier's liability, however, the amount of recovery available remains the same. Where the Convention applies, Article 22(3) limits recovery for carry-on baggage to 5,000 French francs.

language of the Convention, its exclusive nature and underlying purpose all require a finding that liability limitations apply to carriers and their contracted agents alike where the agent performs services that otherwise would have to be provided by the carrier.

The language of the Warsaw Convention is ambiguous regarding whether its liability limitations apply to the agents of carriers. Articles 20(1) and 25(2) of the Convention state that the Convention's liability limitations, and the exception for willful misconduct, were intended to apply to the carrier "and his agents." § 1502 note, art. 20(1). Although the Hague Protocol [6] explicitly includes agents in the Warsaw Convention's applications, the United States is not a party to that agreement. *Julius Young*, 67 A.D.2d at 150.

Despite the ambiguity, courts almost universally have concluded that the language and overall purpose of the Convention, and the exclusive nature of its remedy, require including a carrier's agents within its scope. In the leading case of *Reed v. Wiser*, 555 F.2d 1079, the Second Circuit found the Warsaw Convention applies equally to the employees of a carrier as to the carrier itself. The court accordingly decided that a carrier's employee's may not be held liable for an amount exceeding that recoverable under the Convention. Any other finding would allow plaintiffs impermissibly to circumvent the terms of the Convention by selectively choosing their defendants. *Id.* at 1092.

Injuries to baggage also have been found to be covered by the Convention's provisions even when the injury occurred to the baggage after it left the carrier's possession and was in the charge of a ground freight carrier. *Jaycees Patou, Inc. v. Pier Air International, Ltd.*, 714 F.Supp. 81 (S.D.N.Y.1989). In *Royal Ins. v. Amerford Air Cargo*, 654 F.Supp. 679 (S.D.N.Y.

1987), an air freight forwarder was held to be an indirect "air carrier" within the meaning of the Convention.

On facts almost identical to those at issue here, the *Baker* court found that the contracting security agency, Lansdell, was covered by the Convention limitations, regardless of the specific terms of the agency's contract with the carrier. The court relied heavily on the fact that carriers are required to provide security checkpoints through their agents or employees by federal law. 49 U.S.C.App. § 1356. Under these circumstances, "[t]he precise nature of the parties' agreement is not material." *Baker*, 590 F.Supp. at 171.

This conclusion was confirmed recently in *In re Air Disaster at Lockerbie*, 776 F.Supp. 710 (E.D.N.Y.1991), where the Eastern District found the Convention extended to Pan Am's security agency. The court indicated its holding would have been the same had the agency been an independent contractor. *Id.* at 714. Although Pan Am had indemnified that security agency, the crucial consideration for the *Lockerbie* court was that the agent provided a service "within the scope of the Convention that the airline is otherwise required by law to perform." *Id.* at 713. *See also Johnson v. Allied Eastern States Maintenance Corporation*, 488 A.2d 1341 (D.C.App.1985); *Julius Young*, 67 A.D.2d 148.

Plaintiff attempts to distinguish the above cases by arguing that there, Warsaw Convention coverage was extended to agents because the carrier contracts indemnified the agents. Here, by contrast, ITS and Air France have indemnified each other for all losses resulting from their own negligence, including those resulting from willful misconduct. Def. Ex. § 6. ITS is insured independently for such liability. Plaintiff further argues that because the contract between ITS and Air France states ITS is an independent contractor,[7]

---

**6.** *See* House Comm. on Science and Astronautics, Air Laws and Treaties of the World, 87th Cong., 1st Sess. 1332–1370 (1961).

**7.** Section 11 of the ITS contract with Air France provides:

The relationship between Air France and ITS shall be that of Independent contractors and in no event shall persons employed by either party be held to be construed to be employees of the other.
Def.Ex. 3 § 11.

ITS cannot be considered an agent of Air France capable of invoking the Convention's protection.

Plaintiff's arguments are unconvincing. Nothing in the Convention indicates that carriers may escape either the treaty's liability obligations or its limitations simply by contracting out their liability. Nor may the agents they hire waive the Convention's provisions. The very language and purpose of the treaty is quite to the contrary. As stated above, the fundamental goal of the Convention was to create uniform rules and liability limits in international air travel. Under plaintiff's analysis, simply by inserting an indemnification or independent contractor clause, a carrier could contract out the very act of providing air transport and thereby escape the treaty in its entirety. No possible construction of the Convention can be reconciled with this result.

Certainly, the specific details of a contract cannot trump the provisions of a treaty that is the "supreme Law of the Land" under the Constitution, U.S. Const., Art. VI, § 2, and that has been adhered to by over 100 nations for more than fifty years. Here, as in *Baker*, the crucial consideration is that defendant ITS was providing legally mandated security services "in furtherance of the contract of carriage," *Johnson*, 488 A.2d at 1345, which the air carrier otherwise would have been required to provide and for which the carrier would have been liable. Under these circumstances, ITS's actions are subject to the Convention.

But plaintiff's argument also misconstrues defendant's contract with Air France. The presence of mutual indemnification clauses and the fact that ITS has insurance protection is entirely consistent with the Convention's applicability to ITS. This is particularly true since ITS has indemnified Air France for liability including claims of willful misconduct that are not subject to the recovery limits in the Convention. Likewise, the fact that ITS employees are not considered employees of Air France under the contract does not affect the conclusion that defendant served as Air France's agent in furthering the contract of carriage.

Plaintiff argues from a policy perspective that covering security agency contractors by the Warsaw Convention will raise costs to air carriers and relieve agents of liability for their own misconduct. These policy tradeoffs, however, were weighed when the Convention was adopted, and it is not for this court to second-guess choices the ratifying countries made and to which the international community consistently has adhered. Rather, the overwhelming public policy consideration presented here is that "the rules governing international aviation remain uniform and that liability limitations remain intact, regardless of whom a plaintiff may choose to name as a defendant in a particular case." *Johnson*, 488 A.2d at 1345.

## V. OTHER CLAIMS

Finally, plaintiff challenges defendant's authority to invoke the Convention at this time. Plaintiff argues that under Rules 8 and 12 of the Federal Rules of Civil Procedure the Convention must be raised either as an affirmative defense or in defendant's answer and that defendant has waived this opportunity. Plaintiff also argues collateral estoppel should prevent defendant from invoking the Convention at this time. *See Highlands Ins. Co. v. Trinidad and Tobago (BWIA International) Airways*, 739 F.2d 536 (11th Cir.1984). Both arguments necessarily fail.

Plaintiff cites a number of cases in which the Warsaw Convention's limitations have been raised as a defense by the carrier or its agent. *See Reed v. Wiser*, 555 F.2d 1079; *Baker v. Lansdell Protective Agency*, 590 F.Supp. 165. None of these cases, however, stands for the proposition that the Convention's protection is waived if not initially raised as an affirmative defense, as plaintiff attempts to assert.

Indeed, because the Warsaw Convention provides an exclusive remedy where it is applicable, defendant cannot be required to raise the Convention as an affirmative defense in order to benefit from its protection. To hold otherwise would create the

absurd situation in which a treaty, explicitly intended to create uniform rules and to provide an exclusive remedy, was applicable only where one of the parties happened to invoke it. Such an interpretation would violate both the language of the Convention and its fundamental goal of uniformity. *See Reed v. Wiser*, 555 F.2d 1079.

■ Nor does defendant's invocation of the Convention at this time unduly burden plaintiff's case at a level justifying collateral estoppel. Defendant first raised its concern to plaintiff less than four months after the Complaint was filed and prior to the close of discovery. Although discovery is now complete, Count Two of plaintiff's Complaint alleges willful misconduct, and some discovery on willful misconduct already has been conducted. The accompanying Order provides for further discovery on this question to ensure plaintiff's ability to pursue her case is not adversely affected by this ruling.

## VI. CONCLUSION

To conclude, at the time of the alleged theft, plaintiff's carry-on bag was in the charge of defendant, who served as the carrier's agent in performing tasks legally required of the carrier by federal law. The Warsaw Convention thus provides plaintiff's sole remedy and all claims inconsistent with the Convention, including plaintiff's claims for punitive damages, must be stricken. Plaintiff's recovery, if any, shall be limited to 5,000 French francs unless plaintiff can demonstrate willful misconduct on the part of ITS.