268 F.3d 671 (9th Cir. 2001)
 ESTER DAZO, AN INDIVIDUAL, PLAINTIFF-APPELLANT,
v.
GLOBE AIRPORT SECURITY SERVICES, A DELAWARE CORPORATION; TRANS WORLD AIRLINES, INC., A DELAWARE CORPORATION; CONTINENTAL AIRLINES, INC., A DELAWARE CORPORATION; AMERICA WEST AIRLINES, A DELAWARE CORPORATION, DEFENDANTS-APPELLEES.
 No. 00-15058
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Submitted May 16, 2001*
Filed October 11, 2001
 
 [Copyrighted Material Omitted]
 Christopher Ashworth, San Jose, California, for the plaintiff-appellant.
 Thomas P. Gmelich, Barry A. Bradley, Glendale, California, for defendant-appellee Globe Airport Security Services.
 Bonnie R. Cohen, Kymberly E. Speer, San Francisco, California, for defendants-appellees America West Airlines, Inc., Trans World Airlines, Inc., and Continental Airlines, Inc.
 Appeal from the United States District Court for the Northern District of California; James Ware, District Judge, Presiding. D.C. No. CV-99-20548-JW.
 Before: O'Scannlain, Tashima, and Thomas, Circuit Judges.
 Opinion by Judge O'Scannlain; Dissent by Judge Tashima
 O'Scannlain, Circuit Judge:
 
 
 1
 We must decide whether the Warsaw Convention relating to international air transportation preempts state law claims for damages from the theft of a carry-on bag from an airport security checkpoint.
 
 I.
 
 2
 On May 12, 1999, Ester Dazo ("Dazo") entered Terminal C at the San Jose International Airport, where she intended to board an 11:50 a.m. flight to Toronto, connecting in St. Louis. To enter the secured area of the terminal, persons must pass through a security checkpoint, where they are examined by metal detectors and their possessions are x-rayed. Globe Airport Security Services ("Globe") operates the security checkpoints at San Jose International. Both ticketed passengers and the general public may enter the secured area, which contains both embarking gates and retail establishments.
 
 
 3
 At 10:00 a.m., Dazo approached the terminal's security checkpoint. She placed her carry-on baggage on the x-ray machine conveyor belt, which carried her bags through the x-ray machine and for an additional distance of ten to fifteen feet. By the time Dazo passed through the metal detector, an unknown person or persons had taken her carry-on baggage and disappeared. According to Dazo's complaint, one of the stolen carry-on bags contained jewelry with a wholesale value of approximately $100,000 in the Philippines, and considerably more in the United States.
 
 
 4
 On June 18, 1999, Dazo filed a complaint in the Northern District of California, naming Globe and America West Airlines, Inc., Trans World Airlines, Inc., and Continental Airlines, Inc. (collectively, "the Airlines"), as defendants. Dazo asserted claims for negligence and breach of the implied contract of bailment, and prayed for punitive damages based on the defendants' wilful misconduct.[1]
 
 
 5
 On August 31, 1999, Globe filed a motion to dismiss Dazo's complaint for failure to state a claim upon which relief can be granted. In its motion, which the Airlines joined, Globe argued that Dazo's state law claims were preempted by the Warsaw Convention. In an October 19, 1999 order, the district court granted the defendants' motion to dismiss Dazo's complaint, holding that the theft occurred while Dazo was in the "operations of embarking," and therefore, that the Warsaw Convention preempted her claims. The court also held that Dazo's allegations of wilful misconduct were insufficient to escape Warsaw Convention preemption. The district court granted Dazo leave to file an amended complaint in conformity with its ruling, but entered judgment in the defendants' favor on December 9, 1999 after Dazo informed the court that she did not wish to file an amended complaint. Dazo then filed this timely appeal.
 
 II.
 
 6
 "The Warsaw Convention is an international treaty governing the liability of air carriers engaged in the international transportation of passengers and cargo. The Convention creates a presumption of air carrier liability but, in turn, substantially limits that liability." Insurance Co. of N. Am. v. Fed. Express Corp., 189 F.3d 914, 917 (9th Cir. 1999). See generally Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), reprinted in note following 49 U.S.C. &#167 40105 (the "Warsaw Convention" or the "Convention"). The Convention preempts state and federal claims falling inside its scope. See Warsaw Conv., Art. 24 (stating that claims for personal injuries; for damage to, or loss of, baggage or goods; and for damages occasioned by travel delays, "however founded, can only be brought subject to the conditions and limits set out in this convention."). The Convention's liability limit for carry-on baggage is 5,000 francs per passenger, and the United States has converted this sum to $400 pursuant to the Convention's provision authorizing signatories to convert the liability caps to their national currencies. See Warsaw Conv., Art. 22(3), 22(4); 39 Fed. Reg. 1526 (1974); see also Baker v. Lansdell Protective Agency, Inc., 590 F. Supp. 165, 167 (S.D.N.Y. 1984).
 
 
 7
 The Warsaw Convention applies to "all transportation of persons, baggage, or goods performed by aircraft for hire." Warsaw Conv., Art. 1(1). It defines "international transportation" in part as "any transportation in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the transportation or a transshipment, are situated . . . within the territories of two High Contracting Parties." Warsaw Conv., Art. 1(2). Therefore, Dazo was boarding an "international flight" at the time of the theft of her carry-on baggage, even though she was traveling first to St. Louis, and only then to Toronto. Cf. Insurance Co. of N. Am., 189 F.3d at 917-19 (holding that the Convention governs claims arising from the theft of computer modules from a Memphis warehouse, because the modules were in the course of shipment from Canada to the United States).
 
 A.
 
 8
 We must first decide whether the Convention applies to claims brought against Globe, a company functioning as the Airlines' agent at the time of the theft.[2] The Convention caps the liability of "carriers," but does not define that term. See Warsaw Conv., Art. 22(3) ("As regards objects of which the passenger takes charge himself, the liability of the carrier shall be limited to 5,000 francs per passenger."). See also Warsaw Conv., Art. 22(1) ("carrier" liability to passengers); Art. 22(2) ("carrier" liability for checked baggage and goods).
 
 
 9
 The application of the Warsaw Convention to an airline's agents is a question of first impression in this circuit, but other courts have consistently and almost uniformly extended the Convention's coverage to an airline's agents and employees. See, e.g., Reed v. Wiser, 555 F.2d 1079, 1089-92 (2d Cir. 1977) (holding that employees of an airline are governed by the Warsaw Convention and are protected by its liability limitations); Kabbani v. Int'l Total Serv., 805 F. Supp. 1033, 1039-40 (D.D.C. 1992) (same, in a case involving the theft of carry-on baggage); In re Air Disaster at Lockerbie, Scotland on Dec. 21, 1988, 776 F. Supp. 710, 712-14 (E.D.N.Y. 1991) (holding that a security company was covered by the Convention because it was operating as the airline's agent); Baker, 590 F. Supp. at 170-71 (holding that a security company operating as the airline's agent is covered by the Convention's limits on liability for stolen carry-on baggage). But see Pierre v. Eastern Air Lines, Inc., 152 F. Supp. 486 (D.N.J. 1957) (holding that the Convention did not apply to an airline's agents), declined to follow by Croucher v. Worldwide Flight Serv., 111 F. Supp.2d 501, 504-06 (D.N.J. 2000) (holding that the Convention applied to a company performing cleaning services in furtherance of the contract of carriage).
 
 
 10
 In concluding that Article 22's liability caps should apply to airlines' agents, these courts have noted that while Article 22 only speaks of "carriers," other Convention sections are broader in scope. For example, Article 20(1) states that "[t]he carrier shall not be liable if he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures." Article 25, which addresses wilful misconduct, states in part that "the carrier shall not be entitled to avail himself of the said provisions, if the damage is caused under the same circumstances by any agent of the carrier acting within the scope of his employment." Warsaw Conv., Art. 25(2). In addition, there is strong evidence to suggest that the Convention text, which refers to "transporteurs" in the original French, covers both airlines and their agents. The Second Circuit drew on this ambiguity, and the absence of authority and evidence to the contrary, to hold in Reed that the Convention applied to carrier's employees. As the Reed court explained, "the plain language of the original Convention, read according to the meaning that would ordinarily be given to the pertinent official French-language text, tends to support appellants' contention that its liability limits were intended to apply to a carrier's employees, with little or no further light on the issue being contributed by its legislative history, subsequent events, or decided cases. That interpretation . . . reflect[s] the legal principles of many civil law states, which treat the corporation and its employees as one." 555 F.2d at 1087-88 (footnote omitted).
 
 
 11
 These courts have also cited the need to avoid interpretations of the Convention which would permit plaintiffs to avoid its strictures by suing an airlines' employees or agents, or which would permit carriers to contract out all of their responsibilities, thereby avoiding the Convention's presumption of liability. See, e.g., Reed, 555 F.2d at 1092 ("The district court's decision [holding that the Convention did not apply to an airline's agent] . . . would raise the very real prospect that in future . . . cases the plaintiff would seek to circumvent the Convention's limitation by bringing suit against the pilot or some other employee of the airline involved."); Kabbani, 805 F. Supp. at 1040 ("Nothing in the Convention indicates that carriers may escape either the treaty's liability obligations or its limitations simply by contracting out their liability . . . . Under plaintiff's analysis . . . a carrier could contract out the very act of providing air transport and thereby the treaty in its entirety. No possible construction of the Convention can be reconciled with this result.").
 
 
 12
 Here, the theft of Dazo's bag occurred while Globe was conducting a security check that every airline or its agent must perform. See 49 U.S.C. &#167 44901 ("The [security] screening must take place before boarding and be carried out by a weapon-detecting facility or procedure used or operated by an employee or agent of an air carrier, intrastate air carrier, or foreign air carrier."). In light of the compelling linguistic, textual, and historical evidence marshaled by the Second Circuit in Reed, and the strong policy rationales supporting the extension of the Convention to airlines' agents, we join those courts which have held that the Warsaw Convention applies to airlines' agents. In the instant case, the parties agree that Globe was acting as the Airlines' agent at the time of the theft. Therefore, Globe is a Warsaw Convention "carrier" and the Convention caps Globe's liability to Dazo.[3]
 
 B.
 
 13
 Warsaw Convention Article 22 caps liability for damage to, or loss of, baggage, but it does not determine when these limits apply. To answer this question, we must determine whether a claim for damages from the theft of a carry-on bag falls under Article 17, even though that article governs "bodily injuries," or Article 18, which governs "loss of . . . checked baggage or any goods."
 
 
 14
 In its order granting the defendants' motion to dismiss, the district court held that a claim based on a stolen carry-on bag falls under Article 17, and therefore, that article preempted Dazo's claim. The district court adopted the reasoning set forth in Baker, which held that Article 17 applies to thefts of carry-on baggage when "the passenger only briefly relinquishes physical possession of her hand-carried property for a necessary security check conducted in her presence, but retains responsibility for the transportation of that property." 590 F. Supp. at 168. The Baker court then addressed the question whether the theft of the carry-on bag occurred while Baker was " `in the course of any of the operations of embarking.' " Id. at 169 (quoting Warsaw Conv., Art. 17). To answer this question, the Baker court applied the three-factor test the Second Circuit set forth in Day v. Trans World Airlines, Inc., 528 F.2d 31 (2d Cir. 1975): (1) the nature of the activity the passenger was engaged in; (2) under whose control or at whose direction the passenger was under; and (3) the location of that activity. 590 F. Supp. at 169 (citing Day, 528 F.2d at 33).[4] The court concluded that "where Baker was engaging in an activity which is a legally mandated prerequisite to boarding an airplane, where she was undergoing the required security check at the express direction of [the] defendants' employees and in a part of the terminal restricted to passengers with tickets, it is appropriate to characterize Baker as being in the course of one of the operations of embarking." Id. at 170.
 
 
 15
 In Kabbani, the court engaged in a lengthy comparison of Article 17 and Article 18, and concluded that Article 18 should govern a suit which involved facts identical to those presented in Dazo's complaint. In Kabbani, an unknown person stole the plaintiff's bag from an x-ray machine located at a checkpoint operated by an independent contractor. The stolen bag contained jewels with an alleged value of several hundred thousand dollars. 805 F. Supp. at 1034. The court conceded that "Article 17 most reasonably defines the scope of carrier liability over carry-on baggage in most situations, since carry-on baggage ordinarily does remain in the passenger's control. It would be illogical, in such circumstances, to create a standard for carrier liability to the passenger different from the standard applicable to the bag in the passenger's hand." Id. at 1037. The court then distinguished Kabbani's case from those typical circumstances because she relinquished control over her bag while passing through the security checkpoint. The court held that when the airline or its agent takes control over a carry-on bag, even for a brief period at a security checkpoint, Article 18 governs a claim for a theft of, or damage to, the bag:
 
 
 16
 Where the passenger is in charge of the carry-on item, the passenger must be in the process of embarking or disembarking, consistent with Article 17, for the liability limitations of Article 22(3) to apply. Where, however, the carrier takes charge of the carry-on item but does not check it, Article 22(3)'s liability limitations are applicable, under Article 18, so long as the loss or injury occurs in the airport or on the aircraft. . . . Because defendant did take charge of plaintiff's carry-on bag and because the alleged event occurred in the airport, the Convention is applicable to the facts at issue, regardless of whether plaintiff was "embarking or disembarking."
 
 
 17
 Id. at 1038. To reach this conclusion, the court had to address the interplay between Article 18, which governs"checked baggage or any goods" and Article 4(1), which states that, "For the transportation of baggage, other than small personal objects of which the passenger takes charge himself, the carrier must deliver a baggage check." Kabbani argued that Article 18 could not govern her claim because "checked baggage" is baggage for which a passenger receives an Article 4(1) baggage check. The court rejected this argument, noting that "[n]othing in the treaty requires, or even addresses, the question of whether a claim check is required when the carrier takes temporary charge of a carry-on bag without checking it. In fact, Article 4(1) suggests quite to the contrary, that so long as a bag is not formally `checked,' a baggage receipt for `objects of which the passenger takes charge himself' is not required." Id.
 
 
 18
 We agree with the Kabbani court that if the carrier has taken temporary charge of a carry-on bag, Article 18, and not Article 17, governs a claim for damage to, or loss of, the bag. Some substantive provision must apply the standard for the liability capped by Article 22(3). Our only choices are Article 17 ("bodily injuries"), Article 18 ("checked baggage or any goods"), and Article 19 ("delay in the transportation by air of passengers, baggage, or goods"). Given these choices, the most logical conclusion is that a baggage standard should govern the baggage claim in this case. When a passenger temporarily relinquishes control over her carry-on bag to a carrier, Article 18 governs her claim for damages arising from the loss of, or damage to, the bag. A carrier does not have to provide a baggage check for Article 18 to apply -the distinction between checked baggage and carry-on baggage only is relevant to the amount of the damages recoverable under the Convention.[5]
 
 
 19
 Article 18 preempts all claims for damages arising from the loss or theft of a bag if the loss or theft occurred "during the transportation by air," defined by the Convention as the "period during which the [bag is] in charge of the carrier, whether in an airport or on board an aircraft . . . ." Warsaw Conv., Art. 18(1), (2). Dazo's bags were stolen from an airport security checkpoint at a time when the bags were under Globe's control.[6] Therefore, the theft occurred "during the transportation by air," and Dazo's only cause of action is a claim brought under Article 18, with her potential recovery limited to $400 by Article 22(3).
 
 III.
 
 20
 Dazo argues that the Convention does not preclude her state law claims because Globe's conduct and omissions constituted "wilful misconduct." In Carey v. United Airlines, we held that the Warsaw Convention provides the exclusive remedy for claims arising out of a carrier's intentional (i.e. "wilful") misconduct. 255 F.3d 1044, ___, slip op. at 8295 (9th Cir. 2001). In Carey, we rejected the appellant's claim that Warsaw Convention Article 25's wilful misconduct exception saved his claims from Warsaw Convention preemption. Instead, we held that if a plaintiff establishes wilful misconduct by the carrier, Article 25 lifts the Convention's limits on liability, but the Convention remains the exclusive source for the plaintiff's remedy. See id. at ___ _ ___, at 8292-93. Thus, the Convention preempts Dazo's state law claims, even if she can establish wilful misconduct. For the reasons set forth below, she cannot.
 
 IV.
 
 21
 Convention Article 22(3) limits the damages resulting from the loss of a carry-on bag to $400, unless the passenger can establish that the loss was "caused by [the carrier's] wilful misconduct or by such default on [the carrier's ] part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct." Warsaw Conv., Art. 25(1). The wilful misconduct exception also applies to damage or loss caused by a carrier's agent if the agent was acting within the scope of his employment. Warsaw Conv., Art. 25(2).
 
 
 22
 We previously have held that "the law of the court to which the case is submitted" is the law of the forum jurisdiction. See Ins. Co. of N. Am., 189 F.3d at 919-21 (applying California choice of law rules, and California substantive law, to define "wilful misconduct" in a case filed in the Central District of California).[7] The district court should have analyzed Dazo's wilful misconduct claim under California law, because she filed her complaint in the Northern District of California. While the district court applied federal common law instead of California law, its ultimate conclusion was sound.
 
 
 23
 Dazo's allegation of wilful misconduct was that Globe and the Airlines knew that similar thefts had occurred at the airport, yet failed to make reasonable efforts to prevent these thefts, thereby subjecting her to an unreasonable risk. The district court found that this allegation was insufficient to constitute wilful misconduct, because her grievance was "essentially that Globe failed to completely prevent thefts at the security checkpoint. . . . [A]bsent concrete allegations of intentional performance of acts committed with the knowledge that the theft of baggage would occur . . . a stolen bag is simply not tantamount to wilful misconduct."
 
 
 24
 The district court did not clearly err when it concluded that these allegations do not rise to the level of Article 25 wilful misconduct. Under California law, "willful or wanton misconduct is separate and distinct from negligence . .. . Unlike negligence, which implies a failure to use ordinary care, and even gross negligence, which connotes such a lack of care as may be presumed to indicate a passive and indifferent attitude toward results, willful misconduct is not marked by a mere absence of care. Rather, it involves a more positive intent actually to harm another or to do an act with a positive, active and absolute disregard of its consequences." Calvillo-Silva v. Home Grocery, 968 P.2d 65, 76 (Cal. 1998) (citations and internal quotation marks omitted). The district court properly summarized Dazo's allegations as, at bottom, an argument that Globe should prevent every possible theft. Dazo does not allege that Globe had a positive intent to harm her, or that it had a positive, active and absolute disregard for the consequences of any lapses in security. "[Dazo] in effect asks this court to presume wilful misconduct on the part of the defendant solely on the basis of the fact that . . . luggage was lost or stolen, a presumption that would severely undercut Article 22's limitation of liability." Chukwuma v. Groupe Air France, Inc., 767 F. Supp. 43, 48 (S.D.N.Y. 1991). Dazo's allegations do not rise to the level of wilful misconduct.[8]
 
 
 25
 Once the district court correctly concluded that the Warsaw Convention preempted Dazo's claims, and that the wilful misconduct exception to its liability limits did not apply, the court properly struck Dazo's prayer for punitive damages. Her recovery is limited to $400, which is far less than her claimed compensatory damages.
 
 V.
 
 26
 For the foregoing reasons, the judgment of the district court is
 
 
 27
 AFFIRMED.
 
 TASHIMA, Circuit Judge, dissenting:
 
 
 Notes:
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. See Fed. R. App. P. 34(a)(2).
 
 
 [1]
 The record does not disclose which of the three airlines provided carriage to Toronto.
 
 
 [2]
 In her complaint, Dazo alleged that Globe was the "non-exclusive agent of the Carriers for the performance of the relevant security services," and the parties do not dispute this characterization on appeal.
 
 
 [3]
 The dissent notwithstanding, Globe's association with non-Warsaw Convention carriers does not destroy its "carrier " status. Globe was concededly acting as the agent of a Warsaw Convention carrier when it screened Dazo's baggage. Under traditional agency principles, Globe is an agent of the Warsaw Convention carrier even if it also the agent of other carriers. See, e.g., Restatement (Second) of Agency &#167 226 (stating that an entity may be the agent of multiple principals).
 Further, contrary to the dissent's suggestion, we do not hold that Globe's "carrier" status shields those airlines that did not provide Dazo with international carriage. Dazo has made no attempt to distinguish among the three airlines she sued. Not only does the record not reveal which airline provided her international carriage, her appellate briefs only briefly mention the airlines in passing. Therefore, Dazo has waived any claim against the two airlines that did not provide her with international carriage. See, e.g., Greenwood v. FAA , 28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues which are argued specifically and distinctly in a party's opening brief.").
 
 
 [4]
 We discussed the Day test, and the Article 17 tests adopted by other circuits, in Maugnie v. Compagnie Nationale Air France, 549 F.2d 1256 (9th Cir. 1977). In Maugnie, we did not adopt a specific test to determine when a passenger is embarking or disembarking. Instead, we expressed our preference for "an approach which requires an assessment of the total circumstances surrounding a passenger's injuries, viewed against the background of the intended meaning of Article 17. Location of the passenger is but one of several factors to be considered. " Id. at 1262.
 
 
 [5]
 Compare Warsaw Conv., Art. 22(2) ("In the transportation of checked baggage and of goods, the liability of the carrier shall be limited to the sum of 250 francs per kilogram") with Art. 22(3) ("As regards objects of which the passenger takes charge himself the liability of the carrier shall be limited to 5,000 francs per passenger.").
 
 
 [6]
 In her complaint, Dazo alleged that "[s]he placed her carry-on luggage onto a conveyor belt which transported her luggage onto a conveyor belt which transported her luggage through the x-ray device and for an additional distance of 10 to 15 feet -thereby temporarily surrendering custody and control of her belongings to the [Airlines] and Globe."
 
 
 [7]
 In Insurance Company of North America, we noted that California has adopted the "governmental interest" analysis as its choice of law test for tortious conduct, and we concluded that California would apply its own law to a claim by a California business that suffered harm in California as a result of a theft in Tennessee. 189 F.3d at 921.
 
 
 [8]
 The Convention's wilful misconduct standard was later amended to the formulation "intentionally or recklessly with knowledge that damage would probably result." See Carey, at 1047 n.9 (citing Montreal Protocol No. 4 to Amend the Warsaw Convention, reprinted in S. Exec. Rep. No. 105-20, at 21-32 (1998)). Montreal Protocol 4 went into force on March 4, 1999. Id. Our analysis applies to either formulation of Article 25: Dazo's allegations cannot support the conclusion that Globe acted intentionally or recklessly with knowledge that the loss of Dazo's bag would probably result.
 
 
 TASHIMA, Circuit Judge, dissenting:
 
 28
 I dissent from the majority's unprecedented and unwarranted expansion of immunity under the Warsaw Convention.
 
 
 29
 Globe Airport Security Services ("Globe") operates the security checkpoints at the San Jose, California, International Airport on behalf of three air carriers who operate out of that airport--America West Airlines, Inc., Trans World Airlines, Inc., and Continental Airlines (collectively the"Airlines"). In so acting, Globe is the common agent of all three Airlines, and it was so acting at the time of the theft in question. Further, the theft took place at a checkpoint which screens domestic passengers and international passengers alike, and non-passengers, as well as passengers. As the majority acknowledges, "Globe was conducting a security check that every airline agent must perform" under federal law, maj. op. at 676-77, regardless of whether the flight being boarded is a domestic or international flight, or whether the person being screened is boarding any flight at all.
 
 
 30
 From these facts, it does not follow that "Globe is a Warsaw Convention `carrier,' " as the majority concludes. Id. None of the cases cited by the majority in support of this proposition, see id. at 675-76, so holds and none involved extending "carrier" status to a company that was a dual agent --the agent of more than one airline, including an airline with non-Warsaw Convention status. Two of the cases relied on by the majority, Reed v. Wiser, 555 F.2d 1079 (2d Cir. 1977), and Kabbani v. Int'l Total Serv., 805 F. Supp. 1033 (D.D.C. 1992), simply involved the airline's own employees; In re Air Disaster at Lockerbie, Scotland, 776 F. Supp. 710 (E.D.N.Y. 1991), involved a security company that was a wholly-owned subsidiary of the airline involved, see id. at 711; and Baker v. Lansdell Protective Agency, Inc., 590 F. Supp. 165 (S.D.N.Y. 1984), involved, as far as the record shows, a security company that was the agent exclusively of the air carrier involved, British Airways, see id. at 170. Thus, no case supports the proposition that a security company that is acting as the common agent of multiple airlines, domestic and international, and providing basic airport security services mandated by federal law, regardless of whether the flight involved is domestic or international, should be accorded "carrier " status under the Warsaw Convention simply because the person whose belongings were stolen happened to be ticketed on an international flight.
 
 
 31
 The services being rendered by Globe were not in furtherance of the contract of carriage of an international flight, but were basic airport security services required at all airports by domestic federal law, regardless of the flights' destination and regardless, in fact, of whether the person being screened was even a passenger. See 49 U.S.C. &#167 &#167 44901-44916. These security screenings are not required by the Warsaw Convention. Thus, the Warsaw Convention should not be applied to this case.
 
 
 32
 Even if the Convention were to be applied, however, it should not shield those carrier-principals of Globe who did not provide Dazo's international carriage. Here, the parties agree and the majority accepts that "Globe was the `non-exclusive agent of the Carriers for the performance of the relevant security services' . . . ." Maj. op. at 675 n.2.[1] When a dual agent is acting within the scope of its agency, its principals are liable for their agent's acts. See Restatement (Second) of Agency &#167 216 (1958) (stating that "[a ] principal is often subject to liability for the unauthorized conduct of an agent with respect to matters which, under the agreement creating the relation, he has the right to direct"); id. &#167 265 (stating that a principal is liable for torts of an agent when the agent is acting within the apparent scope of employment). Under the reasoning of the majority opinion, this common law rule would be repealed sub silentio and the remaining two carriers, in addition to the carrier providing the international carriage to Toronto,[2] would receive the windfall of the Warsaw Convention's limitation-of-liability benefit. But there is no reason why this should be so, as it does not further the purposes or policy of the Warsaw Convention.
 
 
 33
 Under long-accepted agency principles, "[a] person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other." Id.&#167 226; see also Abraham v. United States, 932 F.2d 900, 903 (11th Cir. 1991) (citing Restatement for the proposition that "a single act may be done with the purpose of benefiting two masters and both may then be liable for the servant's negligence"). In operating the security checkpoint, Globe, therefore, was acting on behalf of all three Airlines, not solely on behalf of the carrier-principal who actually provided Dazo's international carriage. If not for the Warsaw Convention's limitation of liability, therefore, Globe and all three Airlines would be liable for Dazo's loss. The majority opinion unnecessarily extends that limitation, even though, at most, only the carrier-principal who provided the international carriage is entitled to the Convention's limitation of liability. Both Globe, as agent of the non-Warsaw Convention carriers, and the non-Warsaw Convention carriers themselves should be held accountable for any loss proven without regard to the Convention's limitation of liability.[3]
 
 
 34
 I would reverse the district court's dismissal of Dazo's claims, as preempted by the Warsaw Convention, and remand for trial. For these reasons, I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 The majority acknowledges that"an entity may be the agent of multiple principals." Maj. op. at 677 n.3 (citing Restatement (Second) of Agency &#167 226 (1958)).
 
 
 [2]
 The record does not disclose which of the three carriers was the one providing the carriage to Toronto.
 
 
 [3]
 The majority's protestation to the contrary notwithstanding, see maj. op. at 677 n.3, the necessary implication of its holding is "that Globe's `carrier' status shields those [non-Warsaw Convention] airlines that did not provide Dazo with international carriage." Id. This is so because the majority shields Globe completely in the face of the uncontroverted fact that Globe was acting as the agent of all three carriers. Precisely because "Dazo has made no attempt to distinguish among the three airlines she sued," id., it is inappropriate for the majority to focus only upon Globe as the agent of the Warsaw Convention carrier and to ignore the uncontested fact that Globe was simultaneously acting as the agent of the other two carriers.